**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **MICHELE U. MADISON,**<br><br>Plaintiff,<br><br>v.<br><br>**RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA,**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:26-cv-00052-NKM-JCH<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT** |

Plaintiff Michele U. Madison, by counsel, submits this memorandum in opposition to the Motion to Dismiss the Amended Complaint filed by Defendant Rector and Visitors of the University of Virginia ("UVA"). Dkt. 20; Dkt. 21 ("Mem."). The motion should be denied.

## <u>INTRODUCTION</u>

For eighteen years Michele Madison was the head coach of UVA women's field hockey. She won more games than any coach in the program's history, took her teams to fourteen NCAA tournaments, and won three ACC championships. Am. Compl. ¶¶ 1, 49. In March 2023 UVA formally recommended her for a multi-year contract extension and described her in writing as "one of the most successful coaches in Division I." *Id.* ¶ 50. In July 2023 it gave her a merit raise. *Id.* On October 20, 2023, her team beat previously top-ranked North Carolina. *Id.* ¶¶ 51, 53.

The next night, at the end of a thirteen-hour day of alumnae and donor events, she gave an unscripted speech at the program's fiftieth-anniversary banquet. *Id.* ¶¶ 54-59. She used profanity, and apologized. *Id.* ¶ 59. Less than thirty-six hours later the Athletic Director told her that she "need[ed] rehab" and that her "friends are lying to [her]," and asked whether her sister, sober for twenty years, had "fed [her] drinks all night." *Id.* ¶¶ 56, 62, 65. Two days after that, the Athletic

Director told her she "need[ed] an intervention" and removed her from her team for the rest of the season. *Id.* ¶¶ 69, 71. UVA installed a male assistant in her place and told her players that the season's success was "nearly exclusively" his. *Id.* ¶ 71. No one at UVA spoke to anyone who had sat at her table, a group that included an emergency-room physician and a Virginia judge. No one tested her blood alcohol level. *Id.* ¶¶ 56, 70, 87(b)-(c).

She never coached again. The suspension was never lifted, never reviewed, and never given an endpoint. *Id.* ¶¶ 72, 103. UVA kept Coach Madison away from her team, her staff, her recruits, her office, and her sport for approximately twenty-one months, and then let her contract expire without renewal. *Id.* ¶¶ 4, 72, 102. UVA's own nonrenewal letter, which UVA attached to this motion, describes that period as twenty-one months "without performing any work for the University." Def.'s Ex. B, Dkt. 21-2.

UVA's motion asks the Court to treat that sequence as a paid holiday followed by the natural end of a contract, and to decide on the pleadings that none of it had anything to do with sex. Its own brief describes the events differently. In UVA's words, Coach Madison's conduct on October 21, 2023 "led to her immediate suspension for approximately twenty-one months with pay and the eventual nonrenewal of her Employment Agreement." Mem. 2; *see also id.* at 7. One evening, one course of action, ending an eighteen-year tenure with UVA — and a thirty-three-year coaching career. Whatever one makes of the speech, this case is about what UVA did next. UVA uses the label "paid leave" to argue that the longest part of that course is legally invisible. The Amended Complaint alleges that the whole of it was sex discrimination: an evaluation of a woman's fatigue, grief, appearance, and speaking style through stereotypes UVA did not apply to the men who coach its teams. Am. Compl. ¶¶ 3, 29, 78-90, 104. A tired woman, grieving the recent

death of her wife, was told she needed rehab; a man who berated a broadcaster on national television and swore at a referee was given a free pass. *Id.* ¶¶ 65, 92.

## THE ALLEGATIONS OF THE AMENDED COMPLAINT

Because UVA's statement of facts is drawn largely from its own exhibits and its own characterizations, Mem. 3-8, Plaintiff sets out the facts as the Amended Complaint pleads them. They are taken as true at this stage.

### I. A career UVA itself described as exemplary

Coach Madison has coached for thirty-three years, fifteen of them as a Division I head coach before UVA, and she is a member of the National Field Hockey Coaches Association Hall of Fame. Am. Compl. ¶ 48. At UVA she compiled the most wins in program history, three ACC championships, fourteen NCAA tournament appearances, and national-semifinal appearances in 2009, 2010, and 2019. *Id.* ¶ 49. UVA recommended her for a multi-year extension in March 2023 and raised her salary from $135,500 to $164,832 in July 2023. *Id.* ¶ 50. That fall her team beat previously top-ranked North Carolina. *Id.* ¶ 51. UVA knew that her wife of thirty-five years had died by suicide in July 2022 and that she was in therapy and treated for anxiety and trauma-induced depression. *Id.* ¶¶ 45, 52.

### II. October 21, 2023

The anniversary celebration began for Coach Madison at 8:00 a.m. and included staff and team meetings, a senior lunch, alumnae gatherings, a photo shoot, and a donor reception, at many of which guests offered condolences and recounted memories of her wife. *Id.* ¶ 54. The Amended Complaint alleges that she drank one glass of wine at the mid-afternoon photo shoot, did not finish a second, and had no other alcohol that day. *Id.* ¶ 55. At the banquet she sat with her sister, who

has been sober for twenty years; Dr. Brian Hoard; Dr. Rachel Jennings, an emergency-room physician and former team captain; Judge Tory Willis; and Joan Schatzman. *Id.* ¶ 56. The Amended Complaint alleges that no one at the table saw her drink, that she twice declined Dr. Hoard's offer to bring her something from the bar, and that Judge Willis has stated that she was not intoxicated. *Id.*

She was called to the stage at about 9:00 p.m., after thirteen hours on her feet. *Id.* ¶ 57. Before climbing the dark stairs she removed her three-inch heels, both for footing and because of a preexisting ankle injury. *Id.* ¶ 58. Her remarks were extemporaneous. She used profanity and apologized for it. *Id.* ¶ 59. The Amended Complaint alleges that the audience rose at the close of her remarks, and that the complete recording, which UVA made and holds, captures both the ovation and the audience's laughter. *Id.* ¶¶ 60-61.

### III. The October 23 and 25 meetings and the suspension

On Monday morning, October 23, 2023, Athletic Director Carla Williams and Deputy Athletic Director Steven Pritzker, who made each decision challenged in this case, summoned Coach Madison. *Id.* ¶ 62. Williams held final authority over the discipline of every UVA head coach, including the coaches of men's teams. *Id.* She said that "everyone" found the speech inappropriate; asked how many people had complained, she said "five," out of an audience of more than 150; asked what was objectionable, she said "all of it." *Id.* ¶¶ 63-64. She told Coach Madison, three to five times, that her "friends are lying to [her]," said she "need[ed] help" and "need[ed] rehab," and asked whether her sober sister had "fed [her] drinks all night." *Id.* ¶ 65. Pritzker, who had not attended the banquet, said he had concluded from the video that she was "inebriated." *Id.* ¶ 66. When Coach Madison explained the fatigue, grief, and prescribed anxiety medication, Williams told her she was "making excuses," suspended her for forty-eight hours, and said, "I have

to see if you're mentally and physically fit" to be with the team. *Id.* ¶¶ 67-68. Two days later Williams opened a second meeting with "You need an intervention," rejected the same explanation as "defending" and "making excuses," and extended the suspension for the rest of the season. *Id.* ¶¶ 69-71. No alcohol screening or other objective measure was requested, and no one from her table was contacted. *Id.* ¶ 70. Within days UVA elevated a male assistant, Ole Keusgen, to acting head coach. *Id.* ¶ 71.

The suspension was never lifted. From October 26, 2023, until her agreement expired on July 23, 2025, Coach Madison was barred from coaching, from her office, from contact with her athletes and recruits, and from public-facing program activity. *Id.* ¶¶ 72, 103.[1] UVA opened no investigation, set no endpoint, and conducted no review. Am. Compl. ¶¶ 87(a), (g), 103.

## IV. The charge, the Position Statement, and the nonrenewal

Coach Madison filed a charge of discrimination with the EEOC and later an amended charge. *Id.* ¶¶ 9, 73, 77.[2] No one from UVA interviewed anyone who had sat at her table, before the charge or after it. *Id.* ¶¶ 70, 74(b), 87(b), (g). On August 5, 2024, UVA filed a Position Statement with the EEOC calling her "disheveled," her remarks "erratic, unorganized, rambling," and her speech "appeared impaired," recasting an informal August 2023 conversation about a friend's beer as prior counseling about alcohol, and confirming that UVA had, on or before that

[1] Several paragraphs of the Amended Complaint misstate these dates, giving the agreement's expiration as March 31, 2025, and describing a "seventeen-month" suspension. Am. Compl. ¶¶ 10, 77, 87(g), 88, 110, 111, 113. The agreement expired on July 23, 2025, and the suspension lasted approximately twenty-one months, as the Amended Complaint pleads elsewhere and UVA's Exhibit B confirms. *Id.* ¶¶ 4, 72, 102; Def.'s Ex. B, Dkt. 21-2.

[2] The Amended Complaint gives the date of the original charge as February 15, 2024. Am. Compl. ¶¶ 9, 73, 130. The charge UVA attached to its motion is signed May 21, 2024, Def.'s Ex. C, Dkt. 21-3, and UVA contends the pleaded date is an error, Mem. 6 n.6. This memorandum uses the May 21, 2024 date, and none of Plaintiff's arguments depends on the earlier one. The amended charge was filed May 19, 2025. Am. Compl. ¶¶ 9, 77.

date, told her that her contract "will not be renewed." *Id.* ¶¶ 75, 84, 132(c), 132(f) (first of the two subparagraphs so lettered). The Amended Complaint alleges that, with the Position Statement, UVA gave the EEOC a recording of the speech from which the ovation and the laughter had been removed, and represented it as complete. *Id.* ¶¶ 61, 76, 132(d). UVA formally noticed the nonrenewal on May 12, 2025, and the agreement expired on July 23, 2025. *Id.* ¶¶ 4, 102, 132.

### V. UVA's assignment of coaches and treatment of men

UVA has never assigned a woman to head-coach any of its eleven men's teams; men held five of its twelve women's head-coaching positions at the time of these events, and hold six now;[3] and three men hold the only positions in which a head coach leads both the men's and women's programs in a sport. *Id.* ¶¶ 5, 16-21, 124. Men hold 80 of UVA's 107 coaching positions. *Id.* ¶ 20. The same Athletic Director who suspended Coach Madison supervised Tony Bennett, the men's basketball coach, who three weeks after her speech yelled across the court at an ESPN broadcaster during a nationally televised game, and who in February 2024 swore at a referee and drew a technical foul. *Id.* ¶¶ 81-82, 92. UVA imposed no discipline, opened no investigation, and did not ask whether he was fit to be with his team. *Id.* ¶ 92.[4] The Amended Complaint alleges that UVA gives its male head coaches latitude in language, demeanor, and self-presentation that it denied

---

[3] The Amended Complaint states that men held six of the twelve, citing UVA's 2022-2023 Equity in Athletics Disclosure Act report. Am. Compl. ¶¶ 5, 15, 17. The 2022-2023 and 2023-2024 reports show five, three of whom are the men who lead both a men's and a women's program. The 2024-2025 report shows six. The sixth is the head coach of field hockey, the position Coach Madison held.

[4] The Amended Complaint states that Coach Bennett's February 2024 technical foul gave the opposing team its margin of victory. Am. Compl. ¶¶ 82, 92. That is incorrect: Virginia won that game by two points, as UVA's own Position Statement notes. Def.'s Ex. D, Dkt. 21-4 at 3. The point of the comparison does not depend on the result. UVA's own Position Statement excused the foul as "only the second technical foul he had been assessed in more than 14-years," Def.'s Ex. D, Dkt. 21-4 at 3, measuring Coach Bennett by his career record while measuring Coach Madison by a single evening.

her, and treats complaints about men as "intensity" and "passion" and complaints about women as character defects. Am. Compl. ¶¶ 89-90. Male head coaches were paid more: Stephen Swanson, who coaches UVA's women's soccer team, earned $223,300 in 2023 in his twenty-second season; Lars Tiffany earned $191,280 in his seventh; Bowen Sargent earned $173,900 in his nineteenth. *Id.* ¶¶ 93-95. Coach Madison earned $164,832 after her merit raise, despite her storied career. *Id.* ¶¶ 1, 49, 93-95.

## THE GOVERNING STANDARD

A Rule 12(b)(6) motion tests whether the complaint states a plausible claim, accepting the well-pleaded facts as true and drawing reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility "is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). The Court "evaluates the complaint in its entirety." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

Two further rules govern this motion, and UVA's brief gives effect to neither. First, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a motion to dismiss, because the prima facie case "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 515 (2002). UVA acknowledges the rule, Mem. 9 (citing *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585-86 (4th Cir. 2015)), and then argues each count as though the prima facie elements were pleading requirements. Second, the Fourth Circuit has warned that "discrimination claims are particularly vulnerable to premature dismissal because civil rights plaintiffs often plead facts that are consistent with both legal and illegal behavior, and civil rights cases are more likely to suffer from information-asymmetry, pre-discovery." *Woods v. City of Greensboro*, 855 F.3d 639, 652

(4th Cir. 2017). A court that substitutes its own view of the likely reason for an action "treads through doctrinal quicksand when it is undertaken without the benefit of a developed record." *Id.*

## ARGUMENT

### I. UVA'S EXHIBITS AND CHARACTERIZATIONS CANNOT BE SUBSTITUTED FOR THE PLEADED FACTS

UVA attaches four exhibits and asks the Court to consider all of them. Mem. 2 n.1, 6 n.5, 6-7 nn.7-9. Plaintiff does not dispute the authenticity of the nonrenewal letter (Exhibit B) or the Position Statement (Exhibit D), and the Court may consider them. What the Court may not do is treat them as proof of the facts UVA asserts in them.

#### A. The Position Statement is UVA's account, not an adopted fact

When a document relied on in a complaint was "prepared by or for the defendant," it may "reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 168 (4th Cir. 2016). Where the plaintiff relies on such a document "for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.* at 167. The Amended Complaint relies on the Position Statement for the opposite of its truth: as the vehicle for the stereotyped characterizations it alleges, as a document containing false statements, and as an act of retaliation. Am. Compl. ¶¶ 75, 84, 86, 132(c), 142. UVA may quote its Position Statement. It may not use it to establish that Coach Madison was impaired, or that she had been counseled about alcohol in August 2023.

### B. The recording is offered to prove UVA's defense, and it answers no question the motion presents

UVA asks the Court to watch a recording of the speech and conclude that the speech was "objectively inappropriate as a matter of common sense." Mem. 4; *see id.* at 2 n.1. The motion does not require the recording. Plaintiff does not dispute that she used profanity, and for purposes of this motion she accepts that the recording contains four instances of it.[5] *See* Mem. 2 n.1, 4. The Amended Complaint does not allege that the speech was polished. It alleges that she gave it after thirteen hours on her feet, at the first gathering of long-absent friends since her wife's death, having taken prescribed anxiety medication, and that UVA attributed what it saw to alcohol and then to a disorder, under standards it did not apply to men. Am. Compl. ¶¶ 54-57, 65-70, 83, 86-87, 89-92, 97, 142-143. Taken in the light <u>*least*</u> favorable to Plaintiff, the recording can show how she appeared on a stage for several minutes. It cannot show what she drank or why she appeared as she did, what UVA's decisionmakers believed about her, why they chose a twenty-one-month exclusion and the end of her career over any lesser response, why they reached for "rehab" and an "intervention," or how they treated men who swore and lost their tempers in public, including with their own athletes. Am. Compl. ¶¶ 65, 69, 89(c), 92. Those are the questions on which the counts arising from the banquet turn, and the recording answers none of them.

A video may be considered on a motion to dismiss only "to the extent that [it] 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679-80 (4th Cir. 2024) (quoted at Mem. 2 n.1). UVA does not offer the recording to contradict an allegation on which any element of any claim depends. It offers it to establish the reason UVA says it acted: that

[5] The Amended Complaint describes two uses of profanity. Am. Compl. ¶¶ 59, 64. That count is incorrect; the recording contains four.

her conduct, and not her sex or any perceived disability, explains what followed. Mem. 2-3, 7. Whether an employer's nondiscriminatory explanation is pretext "is a question to be analyzed under the long-familiar shifting burdens regime of *McDonnell Douglas* . . . and not under Rule 12(b)(6)." *Woods*, 855 F.3d at 649. At this stage the question is only whether the employer's explanation is "so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [the] claim of pretext implausible." *Id.* at 649. The Court should decline UVA's invitation to weigh a first impression of the recording against the pleaded account. If the Court were inclined to do so, Rule 12(d) would require that the motion be treated as one for summary judgment, with a reasonable opportunity for both parties to present the pertinent material. Fed. R. Civ. P. 12(d).

There is, finally, a threshold obstacle. A document outside the complaint may be considered on a motion to dismiss only if it is integral to the complaint "and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166; *see Doriety*, 109 F.4th at 679 (video may be considered only if it is "integral" to the complaint "and its authenticity is not challenged"). The Amended Complaint alleges that UVA made and holds a complete recording that includes the audience's laughter and ovation, and that the version UVA gave the EEOC was edited and represented as complete. Am. Compl. ¶¶ 61, 76, 87(h). Exhibit A is not the complete recording. It begins partway through her remarks, without any introduction or opening, and it ends while the audience is still applauding. Video: M. Madison Speech at 0:00-0:03, 7:47-8:05 (Oct. 21, 2023) (on file with Defendant) (Def.'s Ex. A, Dkt. 21-1). Whether Exhibit A is a fair and complete record of the event is disputed, and the Court should not consider it. Plaintiff does not fear the recording. She disputes UVA's descriptions of it and looks forward to addressing them on a complete record at trial. On a motion to dismiss, however, the only question is whether the Amended Complaint,

taken in the light most favorable to Plaintiff, states a plausible claim. Weighing an incomplete recording against the pleaded facts would not answer that question. It would ask the Court to resolve a factual dispute that Rule 12(b)(6) does not reach.

### C. UVA's brief treats accusations the Amended Complaint denies as admitted facts

UVA's brief treats as established an accusation that UVA never acted on when it arose and first relied on only after the charge: that in August 2023 Coach Madison "arrived at work with alcohol on her breath." Mem. 1-2, 3; *see also id.* at 7, 13, 14, 32, 41. The Amended Complaint pleads that her supervisor raised the underlying report with her only "in general terms," as a concern about "a staff member"; that "Coach Madison did not drink"; that his follow-up was an email asking her to help ensure that "no one can question the professionalism of anyone on the field hockey staff"; and that the episode generated "no disciplinary record, no investigation, no formal warning, and no entry in her personnel file." Am. Compl. ¶ 84. Plaintiff's own response to the Position Statement, which UVA made part of Exhibit D, described the report differently, as a student-athlete's complaint about the smell of alcohol at a practice, but on the point that matters it is the same: the complaint "was not directed at Ms. Madison, specifically," and the supervisor "did not address with her any allegation or belief that she had personally consumed alcohol." Def.'s Ex. D, Dkt. 21-4 at 6-7. UVA did not discipline her for it, did not investigate it, and did not record it. The episode first appeared as prior counseling about alcohol in UVA's August 2024 Position Statement, after the charge, when UVA needed a history to fit the stereotype it had already accepted without investigation. Am. Compl. ¶¶ 75, 84, 87, 106; Def.'s Ex. D, Dkt. 21-4 at 3. Reciting an accusation in order to deny it does not admit it. *Cf. Goines*, 822 F.3d at 167-68. Yet UVA's comparator, legitimate-expectations, and disability arguments each treat the accusation as fact. Mem. 13, 14, 41.

UVA's Rehabilitation Act argument has the same problem. UVA says the Amended Complaint alleges that Williams and Pritzker "did not state or suggest she was an alcoholic or had alcohol use disorder," citing paragraphs 60, 104, and 133. Mem. 41. That sentence and its three citations are carried over from UVA's first motion, which addressed the original complaint. Dkt. 14 at 39. They support it in neither pleading. In the original complaint, paragraph 133 alleged that UVA "regarded Plaintiff as having alcohol use disorder." Compl. ¶ 133, Dkt. 1. In the Amended Complaint, the cited paragraphs say nothing on the subject, and the paragraphs that do allege the opposite. Am. Compl. ¶¶ 60, 104, 133; *see id.* ¶¶ 65, 69, 86, 142-143. The Court should decide the motion on the pleading Plaintiff filed.

## II. COUNT I STATES A CLAIM FOR DISPARATE TREATMENT

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). UVA argues that Coach Madison suffered no adverse action, identifies no valid comparator, and was not meeting UVA's expectations. Mem. 9-15. None of the three arguments survives the pleading standard.

### A. Coach Madison suffered adverse employment actions

Under *Muldrow v. City of St. Louis*, a Title VII discrimination plaintiff must show "some harm respecting an identifiable term or condition of employment," and that harm need not be significant. 601 U.S. 346, 355 (2024). The phrase "terms [or] conditions" is not used "in the narrow contractual sense"; it "covers more than the 'economic or tangible.'" *Id.* at 354 (internal quotation marks and citations omitted). *Muldrow* expressly rejected the heightened-harm line of cases, including this Circuit's decision in *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir.

2004). 601 U.S. at 353 & n.1; *see Herkert v. Bisignano*, 151 F.4th 157, 164 (4th Cir. 2025) (recognizing that *Muldrow* "abrogated our decision in *James*"). Two adverse actions are pleaded, and either is sufficient. They are also, as UVA's own brief acknowledges, parts of one course of conduct.

### *1. The nonrenewal of Coach Madison's contract is an adverse action*

UVA declined to renew the employment agreement of an eighteen-year head coach whom it had recommended for a multi-year extension seven months before the events at issue. Am. Compl. ¶¶ 1, 50, 102. That ended her employment. It is difficult to imagine a clearer "harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 355. This Court has treated the nonrenewal of a faculty member's annual contract as an adverse employment action. *See Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 57, 62 (4th Cir. 2023) (ADEA; describing this Court's summary-judgment ruling that a professor employed on an annual contract "suffered an adverse employment action" when it was not renewed). And UVA's own retaliation argument excepts the nonrenewal from the actions it says are not materially adverse. Mem. 33 ("Aside from UVA's nonrenewal decision, none of these are materially adverse employment actions."). UVA does not explain how an action it treats as materially adverse for one purpose could be no harm to a term or condition of employment for another.

UVA's two responses do not hold. It first argues that nonrenewal changed nothing because Coach Madison was already suspended. Mem. 12. That argument would allow an employer to immunize a discriminatory termination by preceding it with a discriminatory suspension. It also assumes the suspension was lawful, which is the question in this case. UVA next argues that nonrenewal concerned only "a potential prospective employment relationship." *Id.* Title VII forbids discrimination in the decision whether to hire at all, 42 U.S.C. § 2000e-2(a)(1); a decision

not to continue the employment of an incumbent head coach is no less covered. The Amended Complaint pleads that the extension was recommended in writing and then withheld as a result of discriminatory gender stereotyping. Am. Compl. ¶¶ 50, 74(e), 78-90, 104, 132(g).

#### *2. A twenty-one-month removal from every function of the job is an adverse action post-*Muldrow

Further, the suspension is independently actionable. For approximately twenty-one months Coach Madison could not coach, attend practice or competition, recruit, supervise her staff, use her office, or represent her program, while a male assistant held her role and was credited with her team's success. Am. Compl. ¶¶ 71-72, 103. UVA calls this an "interim status" in which "the terms and conditions of Plaintiff's employment remain[ed] unchanged." Mem. 11. Its own exhibit says she spent "21 months without performing any work for the University." Def.'s Ex. B, Dkt. 21-2. The term or condition of employment most affected by a suspension is the job itself. Under *Muldrow*, the question is whether the employee was left "worse off" in a term or condition, not whether her paycheck changed. 601 U.S. at 354-55, 359. The plaintiff in *Muldrow* kept her rank and pay and was moved to a different assignment; the Supreme Court said her allegations, "if properly preserved and supported, meet that test with room to spare." *Id.* at 359. The Fourth Circuit, applying *Muldrow* to a Rehabilitation Act discrimination claim on summary judgment, has held that a reassignment stripping the plaintiff of supervisory authority, with no diminution in pay grade, salary, or benefits, presented a jury question whether the change "left her 'worse off,' even if not 'significantly so.'" *Herkert*, 151 F.4th at 165 (quoting *Muldrow*, 601 U.S. at 359). Coach Madison lost every duty her job entailed.

Courts applying *Muldrow* to paid leave have reached the same conclusion, even where the leave was tied to an investigation. The Sixth Circuit held in a published decision this year that a plaintiff placed on paid administrative leave "pending investigation into alleged misconduct" had

plausibly alleged an adverse action, applying the Title VII standard to her proposed Title IX employment-discrimination claim. *Ahmed v. Hamtramck Pub. Schs.*, 178 F.4th 975, 979, 984-85 (6th Cir. 2026). The leave concerned a term or condition of employment because "she was unable to perform her job duties for over a year," and it caused harm because she was replaced, barred from official acts and communication, and harmed in her reputation. *Id.* at 985. The court recognized that *Muldrow* had displaced its prior rule that paid suspension pending a timely investigation was not adverse, observing that "one might reasonably argue that a temporary suspension (even with pay) causes 'some harm' and also concerns a 'term or condition' of the job—all that *Muldrow* now requires." *Id.* at 984-85 (quoting *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885 (6th Cir. 2024)). If leave tied to an investigation can be adverse after *Muldrow*, leave tied to no investigation at all is at least as clearly so.

UVA's authority does not point the other way. Nearly every case it cites for the proposition that paid leave is not adverse involved leave pending an investigation (the exception, *Terrell*, discussed below, involved two days of leave), and nearly all rest on pre-*Muldrow* authority. *Nzabandora v. Rectors & Visitors of Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018) (per curiam), is unpublished, predates *Muldrow* by more than five years, and addressed "placement on paid leave pending investigations." The line it follows traces to *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *abrogated by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60, 64 (2006), a retaliation decision whose adverse-action standard the Supreme Court rejected, and which concerned leave "for a short time to allow investigation." *Downer v. Prince George's County Board of Education* addressed paid leave in a summary-judgment retaliation analysis and rested in the alternative on a legitimate reason. No. 21-1618, 2024 WL 3277563, at *19-20 (D. Md. July 2, 2024), *aff'd on other grounds sub nom. Downer v. Prince George's Cnty. Pub. Schs.*,

No. 24-1704, 2025 WL 1927546 (4th Cir. July 14, 2025) (per curiam) (unpublished). And the Fourth Circuit in *Credle v. Virginia Community College System*, which UVA cites as affirming the proposition, did not reach it; it affirmed the dismissal of the discrimination claims for want of a plausible allegation of racial motive and wrote that it was "skeptical of certain conclusions the district court reached about what constitutes an adverse employment action." No. 25-1072, 2026 WL 509313, at *3 n.4 (4th Cir. Feb. 24, 2026) (unpublished).

Plaintiff recognizes that this Court, screening a pro se complaint earlier this year, stated that courts in this Circuit "have held that placement on administrative leave with pay does not constitute an adverse employment action." *Terrell v. UVA Health Sys.*, No. 3:26-cv-00036, 2026 WL 1122379, at *3 (W.D. Va. Apr. 24, 2026). That statement relied on the district court decision in *Credle*, concerned two days of leave after which the plaintiff returned to work, and was followed by an independent holding that the claim was untimely. *Id. Terrell* did not address *Muldrow*, and it preceded the Sixth Circuit's decision in *Ahmed*. Nothing in it suggests that an exclusion of twenty-one months, never tied to any investigation, ending in the loss of the job, is beyond Title VII's reach.

That distinction matters for a reason beyond duration. The paid-leave cases rest on the premise that leave pending an investigation is a step in a process, a pause while an employer finds out what happened. UVA never investigated. Am. Compl. ¶¶ 87(a), (g), 103. It does not contend otherwise; it argues only that it "was not required to conduct an investigation after Plaintiff filed her EEOC Charge." Mem. 12. Its Position Statement describes the suspension as a consequence of her conduct, not as an interim measure: "Madison was disciplined for her conduct – not her gender or disability." Def.'s Ex. D, Dkt. 21-4 at 4. A suspension that is itself the discipline, imposed without process and maintained until the contract ran out, is not leave pending anything.

Rather, it is the first part of the adverse action, pleaded as based on gender stereotyping, that the nonrenewal completed.

#### *3. UVA's failure to investigate is evidence of pretext*

UVA argues at length that a failure to investigate an EEOC charge is not itself an adverse action. Mem. 11-12. Count I does not depend on that proposition. The Amended Complaint pleads the absence of any investigation, before or after the charge, as evidence that UVA's stated reason was pretextual and that stereotype, not inquiry, drove its decisions. Am. Compl. ¶¶ 32, 87, 105-106. It is relevant for that purpose whatever its status as a freestanding adverse action.

### B. Comparators are not a pleading requirement, and the claim does not depend on them

UVA's second argument is that no male coach "showed up at work with alcohol on his breath and then weeks later, while inebriated (or believed to be inebriated) at a UVA celebratory event, publicly spoke shoeless while using profanity, slurring his speech, grabbing intimate areas of his body, and questioning how his team won." Mem. 13. The argument fails at three levels.

First, it is a prima facie argument. "[E]videntiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made at this point," because "[t]he similarly situated analysis typically occurs in the context of establishing a prima facie case of discrimination, not at the 12(b)(6) stage." *Woods*, 855 F.3d at 650-51. *Woods* reversed a dismissal that had rested on the district court's view that the plaintiff's comparators were not valid, calling that reasoning "fact finding, not the conduct of a common sense plausibility analysis." *Id.* at 650. UVA's cases are not to the contrary. In *Seabrook v. Driscoll*, 148 F.4th 264, 269, 271 (4th Cir. 2025), the pro se complaint said nothing about its two comparators' jobs, their roles, or who disciplined them. The Amended Complaint names the

men, their sports, their tenure, and their pay; alleges that they answered to the same Athletic Director who suspended Coach Madison and who held final authority over discipline of every head coach; and alleges the specific latitude they were given. Am. Compl. ¶¶ 62, 88-95.

Second, UVA's description of what a comparator must have done begins with an accusation the Amended Complaint pleads to be unfounded, the "alcohol on his breath," *see* Part I.C, *supra*, and demands a man who did the same things in the same setting. The comparison does not require identical conduct. The Amended Complaint pleads that the same Athletic Director supervised a head coach who berated a broadcaster on national television and swore at a referee, and imposed nothing; that UVA tolerated donor events in another men's program described internally as "one big drink fest"; and that, by comparison, Coach Madison was suspended within thirty-six hours after one unfounded, stereotype-driven concern and never coached again. Am. Compl. ¶¶ 82, 92, 97. *Seabrook* observed that a comparator's less serious misconduct can "cut[] against" a disparate-treatment claim, 148 F.4th at 271, but it did so on a complaint that said nothing about the comparators' jobs or supervisors. Whether a head coach's televised outbursts and profanity at a referee are less serious than profanity in a banquet speech, and whether those men are similarly situated, are the evidentiary questions *Woods* reserves for a later stage. 855 F.3d at 650-51.

Third, and most fundamentally, the claim is not a comparator claim. It is a stereotyping claim. "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075-76. "[W]e are beyond the day when an employer could evaluate employees by assuming or insisting

that they matched the stereotype associated with their group . . . ." *Id.* at 251. The plaintiff there had been told that she should "walk more femininely, talk more femininely, dress more femininely." *Id.* at 235. The Fourth Circuit has since held, with precedential force, "that imposing unique burdens or stereotypical expectations on an individual based on her membership in a protected group is illicit discrimination, even though the defendant may not discriminate consistently against every woman or minority under all conditions." *Woods*, 855 F.3d at 651. The Amended Complaint pleads how each accusation against Coach Madison operated as a gendered judgment: a woman who removes her heels is "disheveled"; her informal speaking style, admired for eighteen years, becomes "erratic" and "rambling" when she is grieving; her exhaustion is read as intoxication; and a single evening outweighs eighteen years, where a man's outburst is "passion." Am. Compl. ¶¶ 29, 78-86, 90, 104-105. UVA's decisionmakers moved from one evening to "rehab" and an "intervention" without asking a single person who sat with her what she drank, and its Position Statement called her "disheveled" and faulted her for appearing "without wearing any shoes," when she had removed her heels before climbing stairs and giving a speech after spending hours on her feet. Am. Compl. ¶¶ 3, 57-58, 65, 69-70, 75, 79-80; Def.'s Ex. D, Dkt. 21-4 at 2. Whether those judgments reflect neutral standards of conduct or the expectations imposed on women in leadership is a question of fact.

The Amended Complaint grounds those allegations in research on how the same conduct is read differently in women and men who lead, including Alice Eagly's work on role incongruity and Madeline Heilman's on "lack of fit," and alleges that UVA judged Coach Madison by stereotypes about "female appearance, female speech style, and female drinking that it did not apply to male coaches." Am. Compl. ¶¶ 28-29, 104. Those stereotypes account for the scale of what followed. A viewer who found the speech troubling would still have to explain how UVA

got from one speech, by a coach it had recommended for an extension and given a merit raise that year, to rehab, an intervention, and twenty-one months away from her team, without a test, a witness interview, or a review. *Id.* ¶¶ 50, 65, 69-72, 87(b)-(c), (e), 103. The Amended Complaint's explanation is sex stereotyping, and at this stage a plausible explanation is all it needs. Plausibility "is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556), and where a plaintiff pleads facts "consistent with both legal and illegal behavior," the choice between the two explanations belongs to a later stage. *Woods*, 855 F.3d at 652.

### C. Legitimate expectations are not decided on a motion to dismiss

UVA's third argument is that Coach Madison was not meeting its legitimate expectations. Mem. 13-15. That is also a prima facie element, and this Court has observed, in a case against this defendant, that a motion to dismiss "is not the appropriate stage" to resolve it. *Alberti v. Rector & Visitors of the Univ. of Va.*, No. 3:21-cv-00014, 2021 WL 5853598, at *5 n.2 (W.D. Va. Dec. 9, 2021) (Moon, J.), *aff'd*, 65 F.4th 151 (4th Cir. 2023). *Fuller v. Culpeper County*, on which UVA relies, Mem. 40, was a pro se ADA case. The court relied on the complaint's own recitation of the employer's reports of misconduct and noted that, although the complaint alleged high evaluations and two promotions, the most recent came eight months or more before the conduct at issue, so that "substantial time passed" in between. No. 3:22-cv-00058, 2023 WL 2931855, at *9-10 (W.D. Va. Apr. 13, 2023), *aff'd*, No. 23-1500, 2023 WL 8728400 (4th Cir. Dec. 19, 2023) (per curiam) (unpublished).

The argument fails on the pleaded facts in any event. UVA's contemporaneous judgment of Coach Madison's performance is in the record: a written extension recommendation calling her one of the most successful coaches in Division I in March 2023, a merit raise in July 2023, and a win over previously top-ranked North Carolina the day before the banquet. Am. Compl. ¶¶ 1, 50-

51. The Fourth Circuit has held that high ratings, awards, and a raise shortly before an adverse action were enough to create a genuine dispute whether the employee was meeting legitimate expectations, even on a summary-judgment record. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650-51 (4th Cir. 2021). UVA's contrary theory is that the Amended Complaint's own allegations show she was not meeting expectations, because it describes the accusations made against her. Mem. 14. Reciting an employer's accusations in order to allege that they were false and stereotyped is not an admission that they were true. If it were, no plaintiff could plead pretext without pleading herself out of court. *Cf. Goines*, 822 F.3d at 167-68. UVA's own cases, *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301 (D. Md. 2015), and *Mattamu v. County of Fairfax*, No. 1:20-cv-1468, 2021 WL 4477300 (E.D. Va. Sept. 30, 2021), are district decisions applying the prima facie element at the pleading stage; they cannot displace *Swierkiewicz* and *Woods*.

The Amended Complaint also pleads that sex was a motivating factor, 42 U.S.C. § 2000e-2(m): the stereotyped accusations, the absence of any investigation, the replacement by a man, the retrofitting of an August 2023 non-event into a disciplinary history, and the contrast with the treatment of men under the same Athletic Director. Am. Compl. ¶¶ 71, 78-92, 104-106. Count I states a claim.

## III. COUNT II STATES A CLAIM FOR A SEX-BASED HOSTILE WORK ENVIRONMENT

A hostile-environment claim requires unwelcome conduct, based on sex, sufficiently severe or pervasive to alter the conditions of employment, and imputable to the employer. *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 407 (4th Cir. 2022). The standard is disjunctive; a single sufficiently severe incident can suffice. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). The core of Count II is specific: the statements made to Coach Madison

in the October 23 and 25 meetings, and the twenty-one-month exclusion that followed. Am. Compl. ¶¶ 63-72, 110.

### A. The conduct was unwelcome

UVA argues that Coach Madison did not object to the remarks until she filed her charge. Mem. 16. The Amended Complaint pleads that she objected in both meetings. She asked what was objectionable and was told "all of it"; she explained her fatigue, grief, and medication and was told she was "making excuses"; she explained again and was told she was "defending" herself. Am. Compl. ¶¶ 64, 67, 70. Unwelcomeness may be shown by the employee's objection or by the nature of the conduct. *Strothers v. City of Laurel*, 895 F.3d 317, 328-29 (4th Cir. 2018). Both are pleaded. Being told repeatedly by one's superior that one's friends are lying and that one needs rehabilitation is not conduct any employee welcomes.

### B. The conduct was based on sex

UVA argues that by calling the accusations "stereotype-driven," Plaintiff admits they were not based on sex. Mem. 17. The reverse is true. Conduct driven by sex stereotypes is conduct based on sex. *Price Waterhouse*, 490 U.S. at 250; *Woods*, 855 F.3d at 651. The Amended Complaint pleads the stereotype at work, which it calls the "drinking lady" stereotype: the assumption that a tired, grieving woman at a podium must be drunk, and the demand that she enter rehabilitation on the strength of one evening's events. Am. Compl. ¶¶ 65, 83, 86. UVA's response, that the remarks simply "reflect Williams' and Pritzker's concerns about Madison's behavior," Mem. 18, is a competing explanation, which is for discovery and trial. *Woods*, 855 F.3d at 652. Even on its own terms, that explanation has to account for what UVA's decisionmakers did with the information she gave them. Told that she had been exhausted, grieving, and on prescribed medication, and that her sister, sober for twenty years, had not been drinking, the Athletic Director called it "making

excuses," and UVA asked no one who had been at the table that evening. Am. Compl. ¶¶ 67, 70, 87(b). Concern about behavior responds to information. The belief pleaded here did not.

### C. The conduct was severe and altered the conditions of her employment

UVA treats the case at bar as a pair of performance conversations followed by a period in which Coach Madison "was not in any working environment." Mem. 18. The authority UVA cites rejected a hostile-environment claim built on a supervisor's criticism of work performance, a single episode of yelling and table-pounding, and discipline. *See* Mem. 17 (citing *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022)). The statements here were not criticism of coaching. They were, in substance, a diagnosis of a condition Coach Madison did not have, delivered by the official with final authority over her job, in two meetings two days apart: that she needed rehabilitation and an intervention, that her friends were lying to her, and, asked as a question, whether her sober sister had been feeding her drinks. Am. Compl. ¶¶ 62, 65, 68-70, 142. The statements ended in her removal from every part of the job. *Id.* ¶¶ 71-72. Whether that conduct was severe enough to alter the conditions of her employment is a fact-bound judgment made on the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Viewed in the light most favorable to Coach Madison, as they must be at this stage, statements of that kind, made by the official who controlled her job and followed immediately by her removal from it, meet that standard.

Plaintiff maintains the allegations that the hidden workload imposed on female coaches and UVA's characterizations of her to the EEOC contributed to the environment, Am. Compl. ¶¶ 110-111, 113; *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002), but Count II does not depend on them.

### D. The conduct is imputable to UVA

UVA does not dispute imputability. The conduct was that of the Athletic Director and the Deputy Athletic Director, the officials who made every decision at issue, Am. Compl. ¶¶ 62, 112, and it culminated in a tangible employment action: her removal from every part of her job. *Id.* ¶¶ 71-72. When a supervisor's harassment culminates in a tangible employment action, "such as discharge, demotion, or undesirable reassignment," no affirmative defense is available. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *see Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

## IV. COUNT IV STATES A CLAIM UNDER SECTION 703(a)(2)

Section 703(a)(2) makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(2). UVA calls the deterrence allegation "borderline frivolous." Mem. 23. Yet the claim rests on a one-way assignment practice that UVA's own federal athletics disclosures reflect. Am. Compl. ¶¶ 15-21.

### A. Count IV alleges intentional classification by sex

Count IV is a disparate-treatment claim. It alleges that UVA assigns head coaches by sex: it "permits men to coach both sexes, but assigns women to coach only women." Am. Compl. ¶ 21; *see id.* ¶¶ 15-20, 122. It does not challenge a facially neutral practice, and Plaintiff does not assert a disparate-impact theory. UVA's footnote on disparate impact, Mem. 24 n.15, therefore addresses a claim that is not pleaded. The classification alleged is stark: no woman has ever been assigned to head-coach any of UVA's eleven men's teams, or to any of the three positions that lead both a men's and a women's program, while men held five of the twelve women's head-coaching

positions at the time and hold six now. Am. Compl. ¶¶ 16-21, 96, 124; *see supra* note 3. A policy that sorts employees into positions by sex is the conduct the statute names. The Fourth Circuit has so held. A woman who was "employed in a job expressly limited to the protected class" and "excluded from a higher paid classification whose duties she satisfactorily performed" established a prima facie case, because the employer's "segregation of jobs by sex adversely affected her status as an employee." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 444 (4th Cir. 1981).

### B. The classification deprived Coach Madison of opportunities and adversely affected her status

The statute reaches two injuries in the disjunctive: a classification that would "deprive or tend to deprive" an individual of opportunities, and one that would "otherwise adversely affect [her] status as an employee." 42 U.S.C. § 2000e-2(a)(2). Both are pleaded.

UVA suggests in a footnote that *Muldrow*'s standard does not extend to subsection (a)(2) because *Muldrow* construed subsection (a)(1). Mem. 23 n.13. But *Muldrow* did not announce a rule peculiar to one subsection. It read the statutory text and declined to add to it: nothing in the provision required that the harm be significant, and "[t]o demand 'significance' is to add words—and significant words, as it were—to the statute Congress enacted." 601 U.S. at 355; *see id.* at 358 (declining to "add words to the law" to achieve what some employers might think "a desirable result" (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015))). That reasoning transfers directly. Subsection (a)(2) contains no threshold of harm either. It reaches any classification that would "deprive or tend to deprive" an individual of opportunities "or otherwise adversely affect" her status, language at least as broad as subsection (a)(1)'s. A court applying subsection (a)(2) has no more license than the *Muldrow* Court had to add a requirement of significant harm that the text does not contain. The Fourth Circuit has observed that, after *Muldrow*, circuit cases importing retaliation's significant-harm requirement into disparate-

treatment claims "are no longer good law." *Hansley v. DeJoy*, No. 23-1426, 2024 WL 4947275, at *2 (4th Cir. Dec. 3, 2024) (unpublished). And at least one court in this Circuit, after *Muldrow*, has denied summary judgment on claims under subsections (a)(1) and (a)(2) alike, rejecting a recommendation that both failed for want of an adverse action, where the employer assigned positions by national origin. *Dawsey v. Bayerische Motoren Werke AG*, No. 7:22-cv-3738, 2024 WL 4297636, at *2-4, *6-8, *10 (D.S.C. Sept. 26, 2024). Count IV does not depend on *Muldrow* in any event. Long before *Muldrow*, the Fourth Circuit held that confining a woman to a lower-paid, sex-restricted classification and excluding her from a higher-paid one "adversely affected her status as an employee." *Armstrong*, 647 F.2d at 444. The injuries pleaded here are of that kind: lower pay, a heavier uncompensated workload, and exclusion from the men's-team and dual-role positions. Am. Compl. ¶¶ 22, 123-126.

The second injury, an adverse effect on her status, does not depend on an application. The Amended Complaint alleges that UVA's classification confined Coach Madison to a lower-paid category of position, one that carried a larger uncompensated workload and greater complaint-driven career risk, and that "[e]ach of these injuries arose within the position Coach Madison actually held." Am. Compl. ¶¶ 22, 123, 125-126. UVA's answer, that men who coach women's teams would bear the same load, Mem. 26, disputes the allegation rather than showing it is implausible. It also misses the point of the claim. The injury is the one-way door: men move between men's and women's positions, and women may not. Am. Compl. ¶¶ 21, 26.

The first injury is pleaded as well, and UVA's response to it rests on a misquotation. UVA argues that Plaintiff has not alleged that "but for the alleged segregation, she would have applied," and quotes paragraph 25 as alleging only that she was qualified to "lead a Division I program, and [could have sought] a men's-team or dual-role assignment." Mem. 25-26. The bracket replaces the

words that answer UVA's argument. Paragraph 25 alleges that a men's-team or dual-role assignment was "a position she could have sought had UVA's practice not foreclosed those positions to women," that "[s]he did not seek one because UVA's known and unbroken practice made clear that such positions were not available to women," and that she "was deterred from seeking such a position by UVA's practice." Am. Compl. ¶ 25. Count IV repeats the allegation in its own terms. *Id.* ¶ 124. That paragraph pleads her non-application as evidence of the exclusion's reach rather than as a separate item of damage. *Id.*

That is the futile-gesture doctrine as the Supreme Court and the Fourth Circuit have stated it. "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). The message may be communicated "by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups." *Id.* A contrary rule "could exclude from the Act's coverage the victims of the most entrenched forms of discrimination," who "could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups." *Id.* at 367. The Fourth Circuit has applied the doctrine where the employer's workforce and statements made the exclusion plain. *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984); *United States v. Gregory*, 871 F.2d 1239, 1242 (4th Cir. 1989); *see Brown v. McLean*, 159 F.3d 898, 902-04 (4th Cir. 1998).

*Brown*, on which UVA relies, does not support dismissal. It recognized the doctrine and held it inapplicable on a trial record, on judgment as a matter of law after the plaintiff had presented his case, and the plaintiff there did not claim to have been deterred; he did not apply because he assumed he would be considered automatically. 159 F.3d at 902-04. Nothing in *Brown* or

*Teamsters* requires a plaintiff to allege more than the Amended Complaint does: that she knew UVA had never assigned a woman to a men's-team or dual-role position, and that the practice deterred her from seeking one. Am. Compl. ¶¶ 25, 124.

UVA's final argument is that Coach Madison has not alleged she is qualified to coach any sport but field hockey. Mem. 26. The Amended Complaint alleges that she was qualified for a men's-team or dual-role assignment, based on thirty-three years of coaching, fifteen years as a Division I head coach before UVA, service with the national and Olympic programs, and the Hall of Fame. Am. Compl. ¶ 124. UVA's dual-role positions are, by definition, head-coaching positions in which one coach leads the men's and women's programs in the same sport. *Id.* ¶¶ 21, 96. Whether she would have been qualified for a particular position is an evidentiary question. UVA's remaining cases do not help it. *EEOC v. AutoZone, Inc.*, 860 F.3d 564, 565-66 (7th Cir. 2017), and *Seville v. Martin Marietta Corp.*, 638 F. Supp. 590, 591, 593 (D. Md. 1986), were decided on summary judgment and involved, respectively, a lateral transfer with no loss in pay, benefits, or responsibilities and fringe benefits paid to one job classification and not another. *Missouri v. Starbucks Corp.*, No. 4:25-cv-00165, 2026 WL 309714, at *17 (E.D. Mo. Feb. 5, 2026), was a suit by a State that identified no employee who had been harmed at all. None involved a categorical, one-way exclusion of one sex from an entire class of positions, and none addressed the futile-gesture doctrine.

UVA's assertion that Plaintiff "has no standing," Mem. 23, adds nothing. The injuries alleged, lower pay and greater uncompensated work in the position she held and deterred access to positions she was qualified to hold, are concrete, particular to her, and traceable to the classification. Am. Compl. ¶¶ 123-126. Count IV states a claim.

## V. COUNT VI STATES A CLAIM UNDER THE EQUAL PAY ACT

The Equal Pay Act prohibits an employer from paying employees of one sex "at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). UVA argues that the Amended Complaint identifies comparators by title and salary only and pleads the rest in conclusions. Mem. 26-30.

### A. The Amended Complaint pleads job content, not titles

The Amended Complaint does not rest on a shared job title. It alleges that every UVA head coach is employed by the same department, reports through the same athletics administration, works under materially the same form of agreement, and performs the same core functions, which it lists: recruiting and evaluating athletes; designing and directing practice and competition; hiring, supervising, and evaluating assistant coaches and staff; managing a program budget and team travel; ensuring NCAA, ACC, and University compliance; representing the program publicly and to donors; supporting athletes' academic progress and welfare; and producing competitive results. Am. Compl. ¶ 136. It also identifies the comparators by name, sport, tenure, and 2023 salary. *Id.* ¶¶ 93-95. That is job content. Whether the content is in fact substantially equal turns on "the actual requirements, performance, and content of the jobs being compared," which is a question for discovery. *Lovell v. BBNT Sols., LLC*, 295 F. Supp. 2d 611, 618 (E.D. Va. 2003) (quoted at Mem. 28). UVA's principal authorities, *Wheatley v. Wicomico County*, 390 F.3d 328 (4th Cir. 2004), and *Soble v. University of Maryland*, 778 F.2d 164 (4th Cir. 1985), resolved that question on developed records, on judgment as a matter of law at trial and on summary judgment respectively.

The comparison is strongest where UVA's arguments are weakest. Stephen Swanson coached a women's team, in the same department, under the same administration, on materially the same agreement, with the same compliance obligations and the same kind of roster, and was paid $223,300 to her $164,832. Am. Compl. ¶ 95. The distinctions UVA draws between women's and men's programs do not apply to that comparison. UVA itself argues, in its segregation section, that on Plaintiff's own allegations male coaches of women's teams bear the same demands as female coaches of women's teams. Mem. 26. It cannot also be right, in its Equal Pay Act section, that their jobs are too different to compare.

**B. UVA's sport-specific skill argument proves too much**

UVA's central argument is that the required skill is "Division I coaching expertise in the relevant sport," so a field-hockey coach cannot compare herself to a coach of any other sport. Mem. 29 (quoting Am. Compl. ¶ 136). The Act asks whether the jobs require equal skill, not whether the incumbents are interchangeable. On UVA's reading, no head coach at any university could ever state an Equal Pay Act claim unless the university fielded a men's and a women's team in the same sport with coaches of different sexes; the one-way segregation alleged in Count IV would guarantee that the comparison never arose. The Amended Complaint alleges that the skill required is the same: "Division I coaching expertise in the relevant sport, recruiting ability, personnel management, and compliance knowledge." Am. Compl. ¶ 136. Coaching expertise is a skill every head coach must bring in equal measure; that its object differs from one sport to another does not make the skill unequal. UVA's contrary factual assertions, including the length of the men's golf season, drawn from a website of which it asks the Court to take judicial notice, Mem. 29-30 & n.16, are the kind of disputed comparison that cannot, and should not, be resolved on the pleadings. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (a court

considering facts from the public record at the pleading stage "must construe such facts in the light most favorable to the plaintiffs").

### C. UVA bears the burden on its market-rate defense

The "market rate" justification UVA has offered, Am. Compl. ¶ 93, is a claimed "factor other than sex" under 29 U.S.C. § 206(d)(1), an affirmative defense on which the employer bears the burden. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). It is not a basis for dismissal. Count VI states a claim.

## VI. COUNT III STATES A CLAIM FOR SEX-BASED PAY DISCRIMINATION UNDER TITLE VII

UVA concedes the governing difference between the two pay counts: under Title VII, the compared jobs need only be "similar" rather than "equal," and "Madison's burden under Title VII is somewhat lower than under the EPA." Mem. 30-31 (citing *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019)). If Count VI states a claim under the higher standard, Count III states one under the lower. The Amended Complaint pleads that Coach Madison was paid materially less than male head coaches of comparable or lesser tenure and success, including a man who coached a women's team in the same department, and that sex was a motivating factor. Am. Compl. ¶¶ 93-95, 117-118. UVA's demand for the comparators' job descriptions, supervisors, education, and qualifications, Mem. 31, asks for information in UVA's personnel files and describes the evidentiary comparison *Spencer* made on a summary-judgment record. *Woods* reserves that comparison for a later stage. 855 F.3d at 650-52.

Title VII does not limit sex-based pay claims to jobs of equal work. *Cnty. of Washington v. Gunther*, 452 U.S. 161, 168, 178-81 (1981). The Amended Complaint alleges that UVA paid

Coach Madison less while requiring of her thirty-two to forty-two more hours of work a week than it required of the men it paid more. Am. Compl. ¶ 118. That allegation goes directly to Count III.

UVA's repetition of its legitimate-expectations argument, Mem. 32, fails for the reasons given in Part II.C, and for an additional one. The pay disparity alleged runs through Coach Madison's tenure and was set by decisions UVA made before October 2023, including the July 2023 merit raise that still left her below each of the three male head coaches the Amended Complaint identifies, some by tens of thousands of dollars. Am. Compl. ¶¶ 93-95, 117. Her performance at the banquet has no bearing on what UVA chose to pay her before it. UVA also does not address the Lilly Ledbetter Fair Pay Act, under which each paycheck reflecting a discriminatory compensation decision is a separate unlawful practice. 42 U.S.C. § 2000e-5(e)(3)(A); Am. Compl. ¶ 116. Count III states a claim.

## VII. COUNT V STATES A CLAIM FOR RETALIATION

A retaliation plaintiff must allege protected activity, a materially adverse action, and a causal connection. Mem. 32 (citing *McIver*, 42 F.4th at 411). UVA concedes the first element. *Id.* at 32-33. It does not contest the second as to the nonrenewal. *Id.* at 33; *see id.* at 35. The count therefore survives if causation is plausibly pleaded as to the nonrenewal, and it is.

### A. Causation is plausibly pleaded

UVA measures the causal gap from the formal nonrenewal letter of May 12, 2025, and calls it "approximately one year." Mem. 37. But UVA's own brief dates the nonrenewal decision "on or before August 5, 2024," when its Position Statement confirmed that Coach Madison had already been told her contract "will not be renewed." Mem. 12, 33; *see* Am. Compl. ¶¶ 75, 132(f) (first of the two subparagraphs so lettered). Measured from the May 21, 2024 charge, that is at most about two and a half months, which supports, rather than defeats, an inference of causation

at the pleading stage. *See Hollis v. Morgan State Univ.*, 153 F.4th 369, 384 (4th Cir. 2025) (on summary judgment, a gap of "less than three months" is "a degree of temporal proximity that our precedent suggests may allow a jury to infer a causal connection").

Temporal proximity is also not the only evidence pleaded. The rule UVA invokes applies, in its own quotation, only "without other evidence of causation." Mem. 36 (quoting *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025)). The Amended Complaint pleads such evidence. In responding to the charge, UVA gave the EEOC a recording of the speech with the ovation and laughter removed and represented it as complete. Am. Compl. ¶¶ 76, 132(d). It told the EEOC that her speech "appeared impaired" and that she had "reportedly arrived at practice smelling of alcohol," without having tested her or spoken to anyone who sat with her. *Id.* ¶¶ 70, 75, 84, 132(c); Def.'s Ex. D, Dkt. 21-4 at 2-3. And the same officials who suspended her, and who knew of the charge, made the nonrenewal decision. Am. Compl. ¶¶ 62, 132. An employer's response to a charge that avoids every source of exculpatory evidence and reshapes the record it gives the investigating agency is evidence of hostility to the charge, whatever its independent status as an adverse action.

UVA's remaining argument is that the nonrenewal "must have been clear" to Coach Madison in November 2023, when UVA named Coach Keusgen head coach. Mem. 35-37. The Amended Complaint alleges that Keusgen was elevated to *acting* head coach, Am. Compl. ¶ 71; the November 2023 appointment UVA describes comes from a magazine article of which UVA asks the Court to take judicial notice for the truth of what UVA infers from it. Mem. 36 n.18. What Coach Madison should have understood from a news report is a factual inference UVA asks the Court to draw against the non-moving party, which Rule 12(b)(6) does not permit. *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006), which UVA cites for the rule that

gradual adverse actions beginning well before protected activity do not support an inference of retaliation from timing alone, does not apply where the employer escalates after the protected activity to a more drastic step. *Sempowich*, 19 F.4th at 654 (distinguishing *Francis* because a reasonable factfinder could find that, after the plaintiff complained, the employer took "the more drastic approach" of telling her that her employment would end unless she accepted reassignment). The suspension imposed on October 25, 2023 ran for "the remainder of the field-hockey season." Am. Compl. ¶ 71. Keeping her from her team for the seasons that followed, and then ending an eighteen-year tenure, were further decisions, and the Amended Complaint pleads that they followed the charge. *Id.* ¶¶ 72, 74(a), (e). Nor was UVA "proceeding along lines previously contemplated." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam). Before the charge, the only line the Amended Complaint pleads UVA had contemplated for her contract was a multi-year extension. Am. Compl. ¶ 50.

### B. The maintained suspension is also materially adverse

The Amended Complaint alleges that after the charge UVA continued the suspension month by month, never lifting it and never setting an endpoint, until the agreement expired. Am. Compl. ¶¶ 72, 74(a), 132(a). Whether an action would dissuade a reasonable worker from making a charge is judged objectively. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). A reasonable coach told that her removal from her team would continue indefinitely, with no review, while her charge was pending, might well be dissuaded. The Fourth Circuit held in *Herkert* that the same loss of duties that could be a "disadvantageous change" under *Muldrow* could also be found to "dissuade a reasonable worker" from protected activity, and vacated summary judgment for the employer on the retaliation claim. 151 F.4th at 163, 166 (internal quotation marks omitted); *see also Noonan v. Consol. Shoe Co.*, 84 F.4th 566, 575 (4th Cir. 2023) (recognizing that

"[s]uch responsibility-stripping can qualify as adverse action," though finding the change there not materially adverse on that record). UVA's paid-leave retaliation cases are district decisions, two of them on summary judgment. Mem. 33 (citing *Stukes*, *Walls*, and *Webb*).

Plaintiff does not ask the Court to hold that UVA's Position Statement or its failure to interview witnesses is, standing alone, a materially adverse action. Those allegations are pleaded as part of the retaliatory course and as evidence of causation. Am. Compl. ¶¶ 74, 132-133. The Court need not decide their independent status to deny the motion. Count V states a claim.

## VIII. COUNT VII STATES A CLAIM FOR DISCRIMINATION BASED ON A PERCEIVED DISABILITY

Section 504 of the Rehabilitation Act applies the employment standards of Title I of the ADA. 29 U.S.C. § 794(d). Under those standards, an individual is "regarded as having such an impairment" if she "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The definition of disability "shall be construed in favor of broad coverage." *Id.* § 12102(4)(A). UVA quotes the three-part definition of disability, Mem. 40, but not the provision that defines "regarded as." Its argument is that its officials' comments concerned only Coach Madison's "current use of alcohol at work." Mem. 41-42.

### A. The Amended Complaint pleads a perceived impairment, not a perceived evening

The pleaded statements are not about an evening. The Athletic Director told Coach Madison she "need[ed] rehab," "need[ed] help," and "need[ed] an intervention," told her three to five times that her "friends are lying to [her]," and asked whether her sister had been feeding her drinks. Am. Compl. ¶¶ 65, 69, 86, 142. She said she had to determine whether Coach Madison was

"mentally and physically fit" to be with her team. *Id.* ¶ 68. Rehabilitation and intervention are responses to a chronic condition, not to a single evening. A supervisor who says an employee's friends are lying about her drinking is describing a condition the employee is presumed to be concealing. UVA then reached back to an August 2023 report about a beer someone else had ordered to construct a history of alcohol misuse. *Id.* ¶¶ 84, 143. The Amended Complaint alleges that UVA perceived her as having alcohol use disorder and acted on that perception. *Id.* ¶¶ 142-145.

UVA also says the Amended Complaint alleges that Williams and Pritzker did not suggest she had an alcohol disorder. Mem. 41. As shown in Part I.C, the paragraphs UVA cites for that proposition say nothing of the kind, in this pleading or the last, and the paragraphs that address the subject allege the opposite. Am. Compl. ¶¶ 65, 69, 86, 142-143. UVA's own Position Statement, moreover, invoked the rule that "alcoholism or a history of alcohol abuse may constitute a protected characteristic" while distinguishing "misconduct associated with the abuse of alcohol," Def.'s Ex. D, Dkt. 21-4 at 3; Am. Compl. ¶ 86, a framing that itself presupposes alcohol abuse.

UVA's regarded-as authorities either predate or do not apply the statute as amended in 2008, or were decided on records unlike this pleading. *Canon v. Clark*, No. 94-8150-CIV-KING, 1994 WL 549759 (S.D. Fla. Sept. 21, 1994), predates the ADA Amendments Act by fourteen years, and *Dennis v. Fitzsimons*, 850 F. App'x 598 (10th Cir. 2021), and *Coursey v. University of Maryland Eastern Shore*, 577 F. App'x 167 (4th Cir. 2014), are unpublished summary-judgment decisions. In *Sims v. University of Maryland Medical System Corp.*, the court granted summary judgment on a record in which the plaintiff had "no evidence any employee of the Medical Center ever said or believed she had a mental illness," and treated the employer's referral as "an investigative discussion." No. CCB-19-295, 2022 WL 2275891, at *17-18 (D. Md. June 23, 2022),

*aff'd*, No. 22-1884, 2023 WL 8666002 (4th Cir. Dec. 15, 2023) (per curiam) (unpublished); *see also West v. J.O. Stevenson, Inc.*, 164 F. Supp. 3d 751, 773 (E.D.N.C. 2016) (finding *Coursey* unpersuasive on the "regarded as" standard after the ADA Amendments Act). *Sims* also rested on a separate ground: the employee there lost her job because she refused to attend the referral session. 2022 WL 2275891, at *18. The Amended Complaint pleads both things missing in *Sims*: statements attributing a disorder to Coach Madison, and action taken because of that perception. Am. Compl. ¶¶ 65, 69, 142-145. *Eagon v. Cabell County Emergency Medical Services*, 766 F. Supp. 3d 623, 633 & n.9 (S.D.W. Va. 2025), and *Ogan v. Newport Cafe*, No. 6:23-cv-00452-AA, 2023 WL 7622098, at *3 (D. Or. Nov. 14, 2023), stand for the proposition that being drunk, or being perceived as drunk on an occasion, is not a disability. Mem. 41. That is not what is alleged. The Amended Complaint alleges that UVA perceived a chronic disorder and said so, so the perceived impairment was not "transitory and minor." 42 U.S.C. § 12102(3)(B). And the provision UVA invokes, which permits an employer to require that employees not be under the influence of alcohol at the workplace, 42 U.S.C. § 12114(c)(2); *see* Mem. 41 (citing § 12114(c)(1)), addresses conduct. It does not authorize an employer to act on a perception that an employee has a disorder, which is what the demands for "rehab" and an "intervention" reflect. Am. Compl. ¶¶ 65, 69, 72, 86, 143.

### B. The remaining elements are pleaded

UVA's adverse-action and legitimate-expectations arguments are carried over from Count I, Mem. 40, and fail for the reasons given in Part II. UVA itself notes that *Muldrow* applies to Rehabilitation Act claims. Mem. 40 n.21 (citing *Herkert*, 151 F.4th at 164).

UVA's argument that the Rehabilitation Act's "solely by reason of" standard cannot be met, because Coach Madison attributes her difficulty during the speech to fatigue, grief, and

anxiety, Mem. 42-43, confuses Coach Madison's explanation of her conduct, which UVA elsewhere dismisses as excuses, Mem. 2, with the pleaded cause of UVA's decision. Section 504 asks why the employer acted. 29 U.S.C. § 794(a). That Coach Madison was exhausted and grieving says nothing about whether UVA acted because it believed she had an alcohol disorder. The Amended Complaint alleges that it did. In both meetings, what UVA's decisionmakers said to her was about alcohol: that she had been "inebriated" and "need[ed] rehab," and then that she "need[ed] an intervention." Am. Compl. ¶¶ 65-66, 69, 142, 145. Whether that perception was the sole cause is a question of fact. Nor is the claim defeated because Count VII also incorporates the allegation that UVA would not have acted as it did had she been male. Am. Compl. ¶¶ 78, 140. A party "may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). The Amended Complaint also pleads the ADA and the Rehabilitation Act in the alternative, Am. Compl. ¶ 6; Fed. R. Civ. P. 8(d)(2), and under the ADA, as UVA acknowledges, the standard is motivating factor rather than sole cause. Mem. 40. Count VII states a claim.

## IX. DISMISSAL WITH PREJUDICE WOULD NOT BE WARRANTED

UVA asks that every count be dismissed with prejudice. Mem. 43. For the reasons above, no count should be dismissed. If the Court were to find any allegation insufficient, however, dismissal with prejudice would not be appropriate. The Amended Complaint is Plaintiff's first amendment, filed before any ruling on the sufficiency of her claims, and nothing in the motion suggests that any deficiency the Court might identify could not be cured. Leave to amend is to be "freely given when justice so requires," absent reasons such as undue delay, bad faith, or "futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)). None is present. Any dismissal should be without prejudice.

## CONCLUSION

Whether UVA acted because of Coach Madison's sex, and whether it acted because it perceived her as a woman with a drinking problem, are questions of fact. The Amended Complaint pleads facts that make each plausible, and neither can be answered on a motion to dismiss. The motion should be denied in its entirety.

Dated: September 28, 2026

Respectfully submitted,

MICHELE U. MADISON
By counsel

*/s/ Joshua Erlich*
Joshua Erlich (VSB No. 81298)
ERLICH LAW OFFICE, PLLC
1550 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Telephone: (703) 791-9087
jerlich@erlichlawoffice.com

*/s/ Thomas A. Newkirk*
Thomas A. Newkirk (Iowa AT0005791)
(admitted pro hac vice)
NEWKIRK ZWAGERMAN, P.L.C.
3900 Ingersoll Avenue, Suite 201
Des Moines, Iowa 50312
Telephone: (515) 883-2000
tnewkirk@newkirklaw.com

*Counsel for Plaintiff*

## DISCLOSURE AND CERTIFICATION REGARDING GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to paragraph 11 of the Court's Scheduling Order (Dkt. 2), the undersigned counsel for Plaintiff disclose that a generative artificial-intelligence tool was used in the preparation of this memorandum. The undersigned further certify that they have independently reviewed and verified the accuracy of each portion of this memorandum prepared with or edited with the assistance of that tool, including all citations, quotations, and legal authority, and that this memorandum complies with the undersigned's obligations under Rule 11 of the Federal Rules of Civil Procedure. This disclosure does not extend to information gathered using artificial intelligence embedded in legal research search engines, which paragraph 11 expressly excludes.

Dated: September 28, 2026

Respectfully submitted,

MICHELE U. MADISON
By counsel

*/s/ Joshua Erlich*
Joshua Erlich (VSB No. 81298)
ERLICH LAW OFFICE, PLLC
1550 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
Telephone: (703) 791-9087
jerlich@erlichlawoffice.com

*/s/ Thomas A. Newkirk*
Thomas A. Newkirk (Iowa AT0005791)
(admitted pro hac vice)
NEWKIRK ZWAGERMAN, P.L.C.
3900 Ingersoll Avenue, Suite 201
Des Moines, Iowa 50312
Telephone: (515) 883-2000
tnewkirk@newkirklaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including Steven D. Brown, Lindsey S. Komisin, and Katherine L. Yourth, Isler Dare P.C., 1111 East Main Street, Suite 1605, Richmond, Virginia 23219, counsel for Defendant.

*/s/ Joshua Erlich*
Joshua Erlich (VSB No. 81298)